315-0821, People of the State of Illinois, athlete, by Mark Osta v. Timothy McVay, talent, by Kelly Taylor Thank you. Ms. Taylor, good afternoon. Good afternoon. May it please the court. I'm Kelly Taylor from the Office of the State of Colorado Defender on behalf of the defendant, Timothy McVay. There were three issues in the case, a multi-part reasonable doubt issue, a jurisdiction issue, and a suppression issue. Today, I'd like to stand on the first issue and use my time on issues two and three, but I am of course prepared to take questions on any of the issues. The state failed to prove beyond a reasonable doubt that either the first degree murder or the concealment of a homicidal death occurred within the state of Illinois. The judge, when giving his ruling, said, My reasonable inference is that she was dead in your house. I don't know how you did it, but you did it. The judge also said, I still think that's the single biggest issue is the cause of death and where it occurred. Now, the defendant, Mr. McVay, and the decedent, Ms. Olson, they lived six miles apart. Ms. Olson lived in Iowa, Mr. McVay lived in Illinois, and her body was found in Minnesota. There was no cause of death, there was no crime scene, there were no witnesses, and there was no confession. In Illinois, if the body was found in Illinois in the event of a homicide, then the death is presumed to have occurred in Illinois. Here, it was presumed that the death occurred in Minnesota, as the body was found in Minnesota. However, the case was prosecuted in Illinois because Mr. McVay was the last person who admitted to seeing Ms. Olson alive in Illinois. The two were close friends. They spent lots of time together. Ms. Olson spent lots of time in Illinois and a lot of time in Mr. McVay's home. But there was no evidence that Ms. Olson was murdered there. In fact, the lack of convicts' lividity suggests that she was not murdered and put into the trunk of her car in Illinois as the state presented in their case. So Ms. Olson, the way she was found, she had her arms over her head, and the expert said that she was lying flat on her back with her arms over her head. And the lividity suggests that that's the position that she was found in and would have occurred. So, lividity becomes fixed in about close to 12 hours. The expert said up to 24, but the textbook in the case suggests that it's closer to 12. Now, if she were in the trunk of a car, not with her arms all over her head as a human just could not fit in that position. She would have had to be somewhat curled up to fit. The lividity would have been mixed, suggesting a change of position from being in the trunk to being on the ground. However, that was not the case here. Nothing suggested that she changed position from being in the trunk to being on the ground. It just suggested that she was on the ground. Now, in the Illinois Supreme Court case, People v. Holden... So you're saying it would be impossible for her to be in the trunk? Yes, based on the lividity in the case. Because the judge opined here that she was killed between 4 and 6 a.m., which would put her in the trunk of the car from the drive from Illinois to Minnesota for between 9 and 11 hours and 45 minutes, depending on, you know, which... So your argument is the lividity would have been established within 10 to 12 hours? Yes. Of the following death? Yes. Okay. And so you're trying to say that the death would have to have occurred in Minnesota based on the lividity evidence? If not in Minnesota, then somewhere possibly along the way, but definitely not in Illinois and definitely not 11 hours prior based on the lividity evidence. Why is that? Because if she had passed in Illinois and then was in the trunk for 11 hours or so, then the lividity should be mixed from which the body went from presumably a curled position to lying on the ground. Presumably. Speculatively. Speculatively. What kind of car was it? It was a Toyota L1. Uh-huh. It was not a huge SUV. And how tall was she? I don't know. I don't remember if the record even says. Okay, so we really don't know if that could be... It's arguable, but we don't have enough evidence to determine whether or not she could be stretched out in the trunk of a Toyota L1, do we? I just don't think that a human would, you know... I remember her weight, and she was not a particularly overweight person, so I don't want to say for sure, but I believe she was at least 5'5", at least. But I can't... I don't remember specifically. And what is lividity? Lividity is when the person passes away, the blood starts to pool in the body due to gravity, and so here, with the arms up over the head and the legs, at least one leg was extended straight out. The blood was pooling, suggesting that that's how she was found, or where she was found suggested that that's when the lividity would be based. Now, if mixed lividity would occur, moving from a different position, which I still don't think any, just about any human, could fit in the trunk of a Toyota Evalon on their back, legs out, arms up, that just... she would have had to have been in a different position to go from the trunk of a car to laying flat on the ground in Minnesota, and that would have suggested mixed lividity. The lividity would have presented differently, it would have... there would have been some in different areas. How do we know if she was placed in the trunk of a car? We don't. Okay. That's just... that was a state theory. It's a theory, but we don't have any evidence. We have no evidence of that, no, absolutely not. Could be in the back seat. Well, you can see in some of the security videos from the gas station, there didn't appear to be anyone else in the car. Not if they're lying flat dead in the back seat. Well, the state's theory was that she was in her trunk. So, but we really have no way of knowing. Right. But, say... Okay, for us, so in an Illinois Supreme Court case, People v. Holt, that case says that the intent for the murder must form in the state in which the prosecution happens. So in Holt, the defendant there kidnapped someone in Illinois, drove them, later decided to murder them in Wisconsin. Now, if something like that happened here, if it was a kidnapping that started in Illinois, and something happened along the way, they're still coming out with jurisdiction in Illinois. If Ms. Olsen, we know from the record that she was troubled, she wanted to get away, if, you know, based on the state's argument that Mr. McVeigh somehow interviewed, but if she wanted to get away, and that something happened in Wisconsin, Iowa, Minnesota, Illinois still would not have jurisdiction to convict Mr. McVeigh of murder here. Also, even if Ms. Olsen was unconscious in the trunk, which would also, the lividity would not have set in, it's a possibility, if she were unconscious in the trunk, and she passed away in another state, Mr. McVeigh still could not be guilty of concealment of a homicidal death in Illinois, because the offense required that the victim be deceased at the time of the concealment. So there's a case, Pupil v. Salinas, where somebody was, the victims were shot in the car, and then the defendant lit the car on fire, but the evidence from the medical examiner had carbon dioxide in the lungs, showing that the person was not dead when they were shot, and that they were still breathing when they lit the car on fire. So the lighting of the car on fire could not have been a concealment of a homicidal death, because the person was not dead. Here, we have no way of knowing that Ms. Olsen was dead in Illinois. And you said there was no cause of death. There was no cause of death. It was a homicide by unspecified means, which, the best I could tell, that was a first in Illinois. I could not find another case with that issue. No cause of death. The best they have here is guessing, and in Issue 1, I get into more in depth about how it could have even been natural, or it could have been reckless. There's just nothing here to even show a first degree murder, let alone that it occurred in Illinois for purpose of jurisdiction. So are you also contending that Mr. McVeigh is not responsible? No. No, we are arguing he is not responsible, but for purposes of the jurisdiction issue, even if he is somehow responsible, if it occurred in another state, he still cannot be guilty of murder in this state. Okay, thank you. The state did not prove jurisdiction beyond a reasonable doubt, and Mr. McVeigh requests that this Honorable Court reverse his convictions for first degree murder and concealment of a homicidal death. The trial court erred in denying Mr. McVeigh's motion to quash search warrant and suppress evidence, where the warrant application failed to state an offense, and the judge referred to the warrant as bare bones, illustrating that there was no probable cause to search Mr. McVeigh's home. On January 3, 2014, Detective Noh filed a complaint for a search warrant looking for evidence of a missing person. Mr. McVeigh's home was searched, counsel filed a motion to quash the search warrant and suppress evidence, and the judge, at the hearing of the motion, called the search warrant application bare bones twice, but denied defense motion. The search warrant application failed to allege an offense. 725 ILCS 5-108-3 states that a search warrant may be issued for the seizure of any instruments, articles, or things designed or intended for use, or which are or have been used in the commission of, or which may constitute evidence of the offense in connection with which the warrant is issued. The Supreme Court of the United States, in a few cases, has used the phrase particular offense as well. Without a particular offense alleged, there can be no nexus between the evidence and its ability to aid in a particular apprehension or conviction. At this point in time, they could not have alleged murder in their search warrant. There was nothing there. Not enough to allege that a murder had occurred. In the search warrant, the only issue, or the only information, was that Ms. Olson was missing and had lent her close friend her car and her debit card. The last person known to see Ms. Olson is not enough information for probable cause for a search warrant at that person's home. This court said so much in People v. Days that just because someone admits to seeing someone last does not mean that that person's home does not give rise to probable cause for a search at that person's home. Especially because the family had already been in Mr. McDay's home at this point. And Ms. Olson was not there. Police would have known this. He gave them permission on, I believe it was January 1st. The family, he says, I have a window unlocked. Here you have the key to my house. You can go look at my home. And the family went. They looked. Ms. Olson was not there. Not in any distress. There would be no reason to search his home. And there was certainly not probable cause to search. Also, if the search warrant was for a missing person, a non-crime, appears to be an anomaly in Illinois. I have not found any other cases that says it's okay to use a search warrant for evidence of a missing person. Now, the prejudice here was that during the first search of Mr. McDay's home, the legal search, there was a black bag that was found. And Mr. McDay said, oh yeah, I took that bag with me to Las Vegas. Seems like an innocuous statement, except the bag ended up being a major part of the case. Near the body in the case, there was a price tag for a child-sized shovel. And the investigators on the case, they started searching for shovels that were purchased. It was from Big Lots. They started searching all the Big Lots in the area within a range of dates, looking to see if anybody had purchased a shovel. Well, there happened to be one that was purchased on December 29th at a Big Lots in La Crosse, Wisconsin. And the shovel was purchased as well as a black travel bag. Investigators remembered Mr. McDay had a black travel bag. And they then tried to make the connection that it could have been him who purchased the black travel bag and the shovel on that date. Now, if that search had not happened, that last bag, they wouldn't have had photos of it, they wouldn't have had his statement, that he brought it with him to Las Vegas. And there would be no reason to think that the bag was of any evidentiary value here. The judge here, in his ruling, said, I do find that you were in La Crosse, Wisconsin, and you did buy that shovel, and you bought that bag. But without this search, they never would have known about the bag, and that a shovel and a bag were purchased on the same day would be of no important information. Especially because the tag for the shovel was not linked to a specific shovel, it was just a type of shovel. There were seven purchased on the day before in La Crosse, Wisconsin, but they seem to think that was inconsequential to the case. So it's the linkage of the shovel with the black bag that is the relevant evidence for the state, right? Absolutely. And that that black bag, the knowledge of it, was procured through an illegal or a warrant that had no merit, right? Absolutely. Because the search warrant application failed to state an offense and was devoid of probable cause, the trial judge erred in denying Mr. McVeigh the motion to co-opt the search warrant and suppress evidence. Mr. McVeigh respectfully requests that this honorable court reverse its convictions and remand the new trial. What do you understand the effect of a reversal would be in regard to a subsequent trial in Minnesota? If they held the trial in Minnesota? Yeah, if there was a prosecution in Minnesota. Thank you. Thank you. Mr. Austell, good afternoon. Mr. Court? Mr. Court? Defendant Chili has addressed Issue 1, but people will go ahead and address facts related to Issue 1. In the first issue, the defendant asserted that the people failed to prove beyond a reasonable doubt that the defendant murdered Carrie Olsen and concealed her body, and he asserts the people failed to prove that Carrie's death was a homicide. The second issue, the defendant asserted that the people did not prove that the murder or concealment of a homicide occurred in Illinois. These two issues are intertwined, and for the purpose of oral argument, the people will discuss the facts that are relevant to both of these issues. The people proved by extensive circumstantial evidence that the defendant murdered Carrie in Illinois and concealed her body in Minnesota. Sean Anselman found Carrie Olsen's body on his property at 17354 Preston Circle in rural Dakota County on April 5, 2014. Carrie's body was lying beside his driveway, which is about 45, 50 feet from the paved main Preston Circle roadway. There's no clear view from the property to any residents, and the area is totally isolated. Cuffs and burb or carpet were found in Carrie's hair, which matched all the characteristics of the burb or carpet collected from the defendant's house. Carrie's house did not have burb or carpet, and she did not contact the carpet at the carpet business where she worked. She worked in the front office. The carpet that was mass-produced could not be proven to have come only from the defendant's house, but the trial judge could have easily concluded from the totality of the evidence that it had. Carrie's mother, Karen, her sister Jacqueline, and her boyfriend, Justin, said she never loaned her car to anyone. Karen last saw Carrie alive on Saturday, December 28, at about 1 p.m. Carrie planned to get together with her friend Amanda Smith, who was her best friend and was in town visiting from out of town. At 9.31 p.m. on December 28, Carrie texted Amanda, and they arranged to go out on December 29 for lunch and shopping. Amanda sent Carrie multiple texts on December 29, but Carrie did not respond to any of these texts. How do you know she was murdered? Excuse me, Your Honor? How do you know she was murdered? I mean, you know she was dead. How do you know she was murdered? That's the finding of the medical examiner that it was a homicide. And we'll get into more of the evidence that... I mean, this is, as we acknowledge, this is a totally circumstantial case. We don't have a direct gunshot wound, a stab wound, or something like that in this case. It's quite unusual in that respect. But at 9.31 p.m., the defendant called Carrie, and both phones registered on cell towers located in Rock Island. So she was in Rock Island, Illinois, at 3.58 a.m. The defendant claimed that he called Carrie after she had left his house to go get some beverages and cigarettes for him. And the defendant admitted that Carrie was at his house on the afternoon of December 28th, and he claimed that she returned to his house again about midnight on December 28th and remained with him all night long through the morning into December 29th. Now, he claimed to have dropped Carrie off at her house in Davenport, Iowa, at 6.30 a.m. on December 29th. But the defendant attempted a transaction of purchased gas at Carrie's debit card in Rock Island from 6.18 to 6.33 a.m. to get to Minnesota for a flight to the Las Vegas vacation that he had planned. The defendant needed Carrie's car and money because he was broke. He was helply financially dependent on his parents. He did not have a car, and his license was suspended. The defendant claimed that Carrie lent him her debit card to get $400 from a credit union ATM and then to fill her car with gas. The defendant happened to owe Tammy Heggie exactly $400 for the flight to Las Vegas. Carrie's debit card could have been used as a credit card. It is a dual purpose. The pin is only needed when it's used as the debit card or to get gas from an ATM. And the transaction record for Carrie's debit card on December 29th The defendant attempted just before 6.18 a.m. to purchase $55 worth of gas at Gettin' G.O.A.T. gas station in Rock Island, about one and a half miles from north of the defendant's house, but it was declined due to an incorrect pin. Pin, rather. At 6.22 a.m., Carrie's great total video to Avalon is shown on a video arriving at a 7-Eleven Mother Hubbard's gas station in Rock Island, which is about a half mile south of the defendant's house. The defendant attempted to use Carrie's debit card with a gas pump. The card was declined. Inside the gas station, the video showed the defendant used her card as a credit card when he completed the $20 gas transaction just before 6.40 a.m. The defendant admitted he made this gas purchase and that he had to do so in the store. Carrie is not shown on the video in the car or in the store. A December 28 video from the ATM at the IH Mississippi Valley Credit Union in Rock Island, about one mile northeast of the defendant's house, two blocks from the Gettin' G.O.A.T. gas station, where he first attempted to buy gas, shows a car pulling to the ATM, but the driver's face could not be seen. Using Carrie's debit card, the driver made three attempts to obtain $400, but all three attempts that morning at 6.32 and 46 seconds, 6.33 and 11 seconds, 6.33 and 20 seconds, were declined due to an incorrect attendance reading that the driver drove off. The defendant himself admitted he made three unsuccessful attempts to get money from an ATM using her card. Carrie was not shown in this video either. Carrie was alive on December 28. At 2.52, she withdrew $200 from her checking account through the use of the pin at the credit card debt in Fort Idaho. Carrie had a balance of $4,450 in her account, which would have covered all the cash requests the defendant made. The defendant clearly lied about having Carrie's permission to use a debit card, because in order to get the correct pin, the defendant only had to text Carrie or to drive back to his house, which is very close to all three locations where he tried to use the card. The only reason he would not have done so is because Carrie was already dead at this time. At 7 or 7 a.m., Tammy Hagey texted the defendant, text me when you leave, which shows that he had not left Illinois at that time. At 7.35, the defendant texted to her that he was on his way, so he's still in Rock Island at 7.35. He bought a cigar at 7.57, at this outlet in Davenport. He commenced about two miles from Carrie's house, and just east of Route 61, which he took to Minnesota. The defendant had to pass by I-80 heading north on 61, which was the route that Tammy told him to take to get to her house. This shows the defendant lied about dropping Carrie off at her house at 6.30 a.m. and about being confused about the direction he had to take. Then from December 29th, for over a month after Carrie disappeared, her cell phone continued to ping in Illinois, and the last time it was in the area of Camden Park, which is near a landfill, and that's about 7 miles south of the defendant's house. This supports the defendant's guilt of carrying her in Illinois. The totality of the evidence showed the defendant committed the murder. The defendant consisted in lying to Carrie's family in numbers regarding his Las Vegas trip and returning early, and he acted in a manner that was inconsistent with an innocent person. The defendant would not tell Carrie's sister where he was staying in Las Vegas, and he claimed he would find a lie told him early, and he knew exactly where he was staying because it was all arranged long before he left. Tammy had said her hotel checkout time had previously been arranged for 1 p.m. on January 1st. The defendant did not tell her that Carrie was missing until January 1st, and the defendant never discussed leaving early with her. The defendant lied to Tammy about owning a construction company, about the time he was leaving Rock Island on December 24th, and about driving his own sister's car to her house to Tammy's house, that is, instead of using his big company work truck, which he never owned. There wasn't a non-existent truck. The defendant did not tell his parents he was going to Vegas, and he did not timely respond to his parents' texts, including one claiming that the FBI was looking for him, and he called his father. Dave Olson, Carrie's father, contacted the defendant twice, but text and 13 times with a voicemail on December 30th, when the defendant was in Vegas asking if Carrie was living, telling him this was an emergency situation and asking the defendant to call him, but the defendant genuinely did not respond to any of these communications and waited until late in the evening before he first contacted Dave. The defendant lied to Dave about saying that Carrie's car was at the Minneapolis airport. The defendant knew that he had left Carrie's car at Tammy's house in Hastings, and that Tammy's friend Bonnie drove the defendant to the airport. At 1.35 p.m. on January 2nd, the defendant texted Dave that he had changed his plan until he was coming home that day. The defendant told Dave that he would arrive at the airport by 5 p.m., but he arrived after midnight. Now, McCrishy found a receipt showing the defendant lied about the time he left Minnesota to return to Davenport. The defendant did not leave Tammy's house until 3 p.m., and he should have gotten to Davenport by about 9 p.m. Some power brokers showed that he traveled down the Mississippi River and cut back westward across Minnesota, heading into Rochester, and he was next located in Dubuque at about 10.28 p.m. The defendant's lies and his failure to respond appropriately to texts and news that Carrie was missing showed that he murdered her. Now, her nude body, of course, was found in a secluded area about four miles from Tammy Hagey's house in Hastings, Minnesota. The cell tower data showed that the defendant went to this area from Rochester, which is totally out of the way from Tammy Hagey's house. He just needed to continue north from Rochester to get up to Hastings. Instead, he cut northeast back toward Wisconsin, and that took him... This was about 2.58 when his cell phone hit on this tower, which is in Wisconsin, and the defendant ended up being about an hour and a half late getting to Tammy's house compared to when he should have been there. Where was the body located? Where? It was in Minnesota. Where in Minnesota? Dakota County, Prescott Circle. It's near Hastings, which is... Okay, yeah, near Hastings. And where is Hastings located in relationship to Rochester? It's due north, almost due north of Rochester. It would be about, I think it's approximately an hour and a half drive. Okay, does 61 go through La Crosse, Wisconsin? I'm sorry? Does 61 go through La Crosse, Wisconsin? Yes, it does. Okay. And from there, you can... 61 meanders around, goes up the river, goes up through Red Wing, and get up to Hastings and such, if you go that direction. But he ended up going to Rochester and then coming back. Of course, the defendant had this fight to catch, and Tammy had given him most of the directions to get to his own house, which would have taken him completely out of the way from the area where the body was found, but he ended up, his cell phone contacted cell towers all in that location. Captain Rogers, who investigated this case, found that Terry's arms were overhead, which was indicative of her being dragged to that location. He said she was partially covered in grass and dead plant material. She was wearing some jewelry still. She was not robbed. She had a necklace clasped in her hair, and she appeared to have taken very good care of her kid. All of these are, you know, minutiae facts that you're trying to put together on a circumstantial level. Absolutely. But what's your overall theory? That's obviously that she was murdered in Illinois. Yes. Because there is no evidence seeing her alive anywhere else. That's correct. Right? Yes. Yet her body was found in Minnesota. Sure. Put her in a trunk. Yet her body was found in Minnesota. But your theory is, therefore, since there's no evidence showing her alive between Rock Island County and where the body was found, that she must have been dead during that interval of time. Yes, sir. And that we do know reasonably inferred that the last time he was in Rock Island County was a date on the cell phone records, right? On the 29th. Okay. So that's really your theory. Yes, that he killed her at his home and then carried her body. Right. It was in a trunk. And the evidence to support that is there is no sighting of her alive anywhere in that distance between Rock Island County and Minnesota. Correct? That's part of the evidence, yes. Because otherwise, her body is found there. She could have been murdered outside the dug grave. There's no evidence that anyone else could have done it. And the evidence points to the defendant. And so we believe that he did murder her, as I stated, in Rock Island, Illinois, and then transported her. He was heading up to Haiti. This is a rural area that's heavily wooded. Perfect place for the uncle body. And nobody would find it. When was her body found? Sorry? When was her body found? April 2014. Okay. And is there some evidence that he was checking the Hastings newspapers? Yes, Your Honor. When? He searched the website over 100 times from January through April, and he started to get more frequent hits on that website closer to the time the body was found. And we know that the bag that was bought with the shovel, the exact duplicate that he carried with him to Las Vegas was brand new. It made it look like he was a successful construction company owner and such. He didn't want that nasty blue bag that he carried around with him. What's the reasonable inference of all those searches of the Hastings News-Gazette or whatever it's called? He knew she was dead in Hastings and he wanted to make sure nobody was finding her. Okay. So all of what you've said is consistent with him knowing that she was dead and trying to conceal that fact. Yes. What's the evidence that he killed her? The evidence is that he had Katie Smith, his former girlfriend, he sat on her chest and told her she couldn't breathe anymore. So he knew he could do this. Other evidence showed that he had choked Carrie in the past to the point where she was passing out publicly in a bar. So he knew he could also kill her viscerally. He told other people, there's a gentleman in his family, his wife, that having an affair, he told a defendant about this and said he was going to kill her with a knife. And he said, defendants, there are better ways to do this so that you don't show any intention for homicide. And we have a text to a guy named Jopie that seems to indicate that something went on between him and Carrie. And Jopie refers to her in the past tense in that text. So we have a lot of evidence that all piles together that shows the defendant didn't commit this murder. Maybe Jopie killed her. I'm sorry, Your Honor? I said maybe Jopie killed her. There's no indication that Jopie was involved at all. You just said that he knew that she was dead. Well, I'm saying that's because of the text between defendant and Jopie. Not Jopie making a text to defendant. There's no indication of that in the record at all that Jopie had any involvement in this whatsoever as far as the killing. I find what you're talking about, I mean, all of this is circumstantial evidence that he knew that she was dead. And that he tried to conceal that for some reason. But I'm not seeing evidence that he killed her. This is a difficult case, Your Honor. You have to layer all the circumstantial evidence together to find that he did kill her. And a serious clue on this, of course, is the carpet that came from, we believe it came from his house. He had the carpet rolls and fresh furniture carpet on his house. And it matched exactly the vibrant color, style, and everything of those carpets. And we understand that this is a mass-produced carpet. We can't say definitively this was the carpet from his house. But with all the other evidence, this shows that he murdered her. Well, wasn't there evidence that he spent a lot of, that she spent time there? Well, they used to live together for a period of time, and they communicated regularly. And, of course, she was there the night that she went missing. That's another piece of the puzzle. And he's got her car. She never loaned her car to anyone. He has a debit card. She never loaned her debit card to anyone. He wanted exactly $400, the amount that he needed to pay for that flight. I'm not disputing any of that. I'm just trying to find where the evidence is that he killed her. There's no gunshot wound. There's no stabbing. That's what makes this case unique. We admitted that earlier. This is a very difficult case. We admit it. But all the evidence, when we put it together in order, it shows no one else. This man is lying all the way along. He doesn't act like a normal, innocent person would have done. When he's in Las Vegas, finds out she's missing, everybody's trying to find her, he's really nonchalant about this thing. He's lying about where he's at. He's lying about when he's coming home. He lied about when he left. Everything is a lie, Your Honor. It all points to him being the murderer. No one else would have lied about all these just inconsequential things about what hotel you were at. You won't say it. Like, oh, I couldn't call you back because my cell phone didn't work, but his cell phone was working. Everything adds up, Your Honor, and then her cell phone ends up still being in Illinois, and he was the last one to call it before it disappeared. And he admitted she was in the house. It all points to him, Your Honor. Any other questions? No, we're not. Thank you, Your Honor. Thank you. Ms. Taylor, any rebuttal? So many of the points that counsel made, you know, we addressed in the brief and in the reply, but there's just a few things I wanted to touch on. That Mr. McVeigh was a jerk to Tammy Heggie is undisputed, but that certainly does not mean that he committed first-degree murder, especially against someone who was such a close friend of his. The trial judge here points out in his verdict that at one point they had something like 500 messages within a period of three weeks, messages of phone calls between Tim and Carrie. They were close friends. He knew things about her life, about frustrations with her family, you know, that the average person wouldn't know about, that her family might not have known about. And it was confirmed by the detective during questioning. You know, she was thinking about quitting the family business, and she's having all kinds of family problems. Where does this all go to? Going to, this is back to my point that while he may have been a, maybe he was a jerk to some women, doesn't mean that he would murder his close, very close friend over the use of a car, an abandoned car. Also, thanks to Justice McDade's, you know, confusing what were the evidence here, we have been only arguing that Mr. McVeigh killed Ms. Olsen, but in the event that there was an accident, if something reckless happened, if she was trying, or maybe she was trying to get away, whatever. He could have placed her body in Presley Circle without killing her, without committing first degree murder. I mean, there's just a whole host of things that could have occurred here other than first degree murder, especially with just no evidence. And the state says that the evidence is that the medical examiner says that it was a homicide. Well, as I argued in Part C of Issue 1, by the medical examiner's own criteria, it really shouldn't have been a homicide. It really should have been considered undetermined, because usually a homicide by unspecified means is used in cases where a victim is found dismembered, burnt, bleeding, where it's very evident that some kind of murder occurred, but the body's so decomposed, you can't tell precisely what happened. That's usually a homicide by unspecified means. Well, didn't he say that one of the reasons that this is what he put down was because of how she was found and that she was naked with her, you know, and it's the wintertime, she's naked, hands and arms over her head, and that that would indicate that it wasn't, you know, either a suicide or a natural death because of that, which would be similar to if there was, you know, a fire, or you were bound or something, that the indications would link and would lead you to inference that it was a homicide rather than a natural death. And that's, you are correct. That is why Dr. Middleton used that specification, except the homicide by unspecified means, it can only be labeled when the search for a more traditional anatomic diagnosis should have already been exhausted. So if there was some kind of natural cause of death, if there was, if she had had a stroke or something totally off the cuff, yes, the arms over the head, being nude in the snow, that indicates that maybe somebody placed her there, but it doesn't mean that someone murdered her, committed first-degree murder, and especially when not all natural causes of death rolled out in this case. And so, under the qualifications, it really should have been considered undetermined here. One of the most interesting things in this case is the PIN number, how the defendant, he entered in the PIN number of 1584, which he said Carrie told him was the garage code, and actually was the garage code when he was living with her at her house. So, I mean, he got that number from somewhere, and then he said, oh, it was wrong, and I didn't have, you know, I entered it, the money was for her, it wasn't for me, so when I got back to the house, I said, hey, here's your card back, I couldn't get your money out for you, because the PIN wasn't right. And she said, oh, it's Amanda's birthday. Okay, well, he didn't know that the PIN had been changed, and it was now Amanda's birthday, but he knew that it was 1684, which was based on Amanda's birthday, and I just don't buy that she would keep a PIN number in her wallet next to her debit card. You're really not supposed to do that. Everybody knows, you know, you get the wallet stolen. And also, with the cell phone evidence that the state mentioned, so it was, it stopped connecting to the network, and then all of a sudden it started connecting again while Mr. McVeigh was in Las Vegas. And the state, the judge here, came up with some theory that it might have been placed in a dumpster without any evidence that a dumpster would preclude a phone from connecting to a network. Also, if this phone had been on the whole time and trying to connect, it was cold, it had been over a day, maybe closer to two, certainly the battery would have died and it wouldn't be still connecting to the network. So somebody had that cell phone and something happened and it started connecting again, it was turned on. So that's the most interesting piece of the evidence in this case. And also back to the, what the state mentioned, the Katie Smitty, I mean, that's just not proof that he knows how to murder people. He was drunk, she was sleeping on the couch, she was sitting on her chest, kind of flicking her nose, saying, wake up, wake up, wake up. That is not practice for how to murder someone. Also, he wasn't successful. There's no way that he would have known, oh, if I sit on someone until they die, they would have no signs of death, when really, oftentimes there would be the tiki eye, the congestion of the face. And then finally, the comment to Joe about don't use a knife, I think the average person would tell you not to use a knife, even if they're not a murderer, don't know how to murder, not planning to murder, you know, just, it would be messy. I mean, that's just common sense. Thank you.  We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision.